THE AETNA-STANDARD ENGINEERING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20163. Promulgated September 25, 1950.

*Aaron Holman, Esq.*, and *I. Newton Brozan, Esq.*, for the petitioner.
*Lawrence R. Bloomenthal, Esq.*, for the respondent.

OPINION.

HARRON, *Judge:* *Issue 1.*—During the fiscal year ended June 30, 1941, and the fiscal period ended November 30, 1941, petitioner paid commissions totaling $59,496.24 to Milburn & Brady, Inc., a manufacturer's agent. Respondent contends that the commissions paid are not deductible from petitioner's income because they did not constitute ordinary and necessary business expenses within the meaning of section 23 (a) of the Internal Revenue Code. He alleges that the

commissions paid by petitioner were for services performed by Milburn & Brady, Inc., in unduly influencing government officials to award defense contracts to petitioner, and that the deduction of such expenses would be against public policy.

If petitioner made payments to Milburn & Brady, Inc., for services performed in unduly influencing government officials to award contracts to petitioner, the payments so made would be against public policy and therefore not deductible from income. *Harden Mortgage Loan Co.* v. *Commissioner*, 137 Fed. (2d) 282, certiorari denied, 320 U. S. 791; *T. G. Nicholson*, 38 B. T. A. 190; *Easton Tractor & Equipment Co.*, 35 B. T. A. 189. However, there is no evidence in this proceeding that Milburn & Brady, Inc., exercised personal influence with any government representative to obtain the contracts which gave rise to its compensation. The services performed for petitioner by Milburn & Brady, Inc., were proper. The use of manufacturer's representatives to give assistance in soliciting business is a common practice among business concerns dealing with the Government. And petitioner was under no obligation to use the services of a manufacturer's representative who was unfriendly with the government officials with whom he had to deal. The contracts were awarded to petitioner after the submission of competitive bids. The situation here is the same as in *Alexandria Gravel Co.* v. *Commissioner*, 95 Fed. (2d) 615, reversing 35 B. T. A. 323, in which it was held under similar facts that an agent's commissions were deductible. In the *Alexandria Gravel Co.* case, the contracts involved were let on competitive bids and the Court said: "There was really small opportunity for the use of influence, if possessed." In addition, Milburn & Brady, Inc., continued to perform many services for petitioner after the contracts were secured, such as obtaining priorities, securing subcontractors, and obtaining the approval of the Government of changes in specifications. The compensation which petitioner paid to Milburn & Brady, Inc., was in part for these services, which respondent does not contend were improper.

The commissions paid by petitioner for the many services performed by Milburn & Brady, Inc., were ordinary and necessary business expenses, and their deduction is not against public policy.

Respondent argues further that even if the commissions were paid for the performance of services which were not contrary to public policy, the payments made exceeded reasonable compensation for the services performed. We do not agree with this contention. Petitioner has shown that the commissions paid were reasonable compensation to Milburn & Brady, Inc., for its services to petitioner.

Petitioner was in bad financial condition before it retained Milburn & Brady, Inc., to aid it in securing business. It had a well-equipped

plant and good personnel but few manufacturing contracts. Milburn & Brady, Inc., materially helped petitioner to obtain two large government contracts, of which petitioner was in great need. The evidence discloses that Milburn & Brady, Inc., obtained information for petitioner which enabled it to submit bids on the gun carriage contracts involved herein. It aided in the preparation of these bids and represented petitioner at their formal filing at the Watertown Arsenal. After the bids were submitted, Milburn & Brady, Inc., gave information to officials of the Army Ordnance Department which helped petitioner to receive the contracts.

Nor did the services of Milburn & Brady, Inc., stop once the contracts were awarded. It represented petitioner in obtaining an advance payment of $750,000 from the Government for working capital and additional facilities; it handled negotiations with the Army whereby the filing of a security bond which petitioner was having difficulty obtaining was waived; it obtained priorities for materials needed by petitioner; it arranged with the War Department for changes in the specifications called for by the contracts; it secured subcontractors to manufacture parts for petitioner which it needed under the government contracts.

The compensation paid by petitioner for the many services performed by Milburn & Brady, Inc., was less than 1½ per cent of the compensation received by petitioner for the performance of the contracts which were secured through the efforts of Milburn & Brady, Inc. The only relationship between petitioner and Milburn or Brady was that of employer and employee. Neither Milburn nor Brady was an officer, stockholder, or director of petitioner, or related to anyone who was. The commissions paid by petitioner were comparable to those paid by other manufacturers for the same type and extent of services as were performed by Milburn & Brady, Inc.

It is held that the total commissions paid by petitioner to Milburn & Brady, Inc., were reasonable compensation for the services performed.

*Issue 2.*—The question under this issue is whether petitioner is entitled to report income from the government contracts for the production of gun carriages on a percentage of completion basis. Originally, petitioner reported its income from the government contracts on an accrual basis, under which it reported gross income and deducted expenses as each gun carriage was completed, delivered to the Army, and the right to receive payment therefor accrued. Subsequently, petitioner filed amended returns under which it reported its income from the government contracts on the basis of the percentage of the contract completed in each period and filed claims for refunds with the collector of internal revenue for the eighteenth district of Ohio. If petitioner is entitled to report the income on a percentage of com-

pletion basis rather than on the accrual basis which it originally employed, the total income to be reported over the period of the contracts will not be changed. However, the allocation of the income among the different fiscal periods will be materially affected, with a consequent change in the excess profits tax payable by petitioner.

Petitioner contends that it is entitled to report the income from the government contracts on a percentage of completion basis on the ground (1) that the government contracts were long term contracts within the meaning of sections 736 (b)[1] and 721 (a) (2) (B)[2] of the Internal Revenue Code, and (2) in the alternative, that it regularly kept its books on a percentage of completion basis and that the method which it used to record on its books the income from the government contracts conflicted with this method. We do not agree with either contention.

Under section 736 (b) or section 721 (a) (2) (B) which it supplanted, if it is abnormal for a taxpayer to receive income from contracts the performance of which requires more than 12 months, it may elect to report the income from such contracts on the basis of the percentage of the contract completed in each period rather than all in the period in which the contract was completed. The question under either section 736 (b) or section 721 (a) (2) (B) is the same.

Petitioner contends that the two government contracts were long term contracts which entitles it to the benefit of the relief provisions of section 736 (b). It argues that the contracts were not performed until the last gun mount contracted for had been delivered. However, the clear purpose of section 736 (b), as disclosed by its congressional history, was "to provide relief to taxpayers reporting income from long term contracts [i. e., contracts whose performance requires more than 12 months] *upon the completed contract method of accounting.*"

---

[1] Sec. 736.

(b) Election on Long-Term Contracts.—In the case of any taxpayer computing income from contracts the performance of which requires more than 12 months, if it is abnormal for the taxpayer to derive income of such class, * * * it may elect, in its return for such taxable year for the purposes of this subchapter, or in the case of a taxable year the return for which was filed prior to the date of the enactment of the Revenue Act of 1942, within 6 months after the date of the enactment of such Act, to compute, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, such income upon the percentage of completion method of accounting. Such election shall be made in accordance with such regulations and shall be irrevocable when once made and shall apply to all other contracts, past, present, or future, the performance of which required or requires more than 12 months. * * *

[2] Sec. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) Definitions.—For the purposes of this section—

(1) Abnormal Income.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, * * *

(2) Separate Classes of Income.—Each of the following subparagraphs shall be held to describe a separate class of income :

* * * * * * *

(B) Income constituting an amount payable under a contract the performance of which required more than 12 months ;

(Emphasis added.)  Sen. Rep. No. 1631, 77th Cong., 2d Sess. (1942), p. 208.  The report continues:

Such income is bunched in the year in which it is reported and unless it is spread out over the period of the contract under which the work has been performed a distorted picture of the taxpayer's true earnings for such year is presented.  Since only one excess profits credit would be allowed in computing adjusted excess profits net income for such year, whereas several excess profits credits would have been utilized if the income from the contract were returned in the years during which the work was being done, an inordinate excess profits tax would be collected from such taxpayer upon such income.  Your committee has therefore provided that if it is abnormal for the taxpayer to derive income from contracts the performance of which requires more than 12 months * * * such taxpayer may elect for excess profits tax purposes, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, to compute in its return for such taxable year its income from such contracts upon the percentage of completion method of accounting.  When once made this election shall be irrevocable and shall apply to all other contracts, past, present, or future, the performance of which requires more than 12 months. The net income of the taxpayer for each year prior to that with respect to which such election was made, including the base period years of the taxpayer, shall be adjusted for excess profits tax purposes to conform to this election. Income from contracts the performance of which requires more than 12 months shall not be considered abnormal income under section 721.

The method used by petitioner in reporting income from the government contracts, which it is seeking to change to the percentage of completion basis, was not the completed contract method which section 736 (b) is designed to relieve.  Under the accrual method employed by petitioner, it reported gross income and deducted expenses on the government contracts as each gun carriage was completed, delivered to the Army, and the right to receive payment therefor accrued.  It did not wait until the last gun mount had been completed and delivered to report income and deduct expenses as it would do if it had been using the completed contract method.  *Jud Plumbing & Heating, Inc.*, 5 T. C. 127, affd., 153 Fed. (2d) 681; Regs. 111, section 29.42-4.  Under the accounting method used by petitioner, there was no practical inability to determine in any one taxable period the profit earned on the gun carriages delivered in that period.

The contracts between petitioner and the Government were not the type of contract envisaged by section 736 (b).  Each of the contracts was a divisible contract, providing for successive deliveries of gun carriages by petitioner and payments therefor by the Government. Williston, Treatise on the Law of Contracts, section 861 (Rev. ed. 1936) ; Uniform Sales Act, section 76.  By the terms of the agreements, the price was apportioned against the performance so that when an apportioned part of the performance had been rendered, a debt for that part immediately arose.  *Brightwater Paper Co.* v. *Monadnock Paper Mills*, 68 Fed. Supp. 714, affd., 161 Fed. (2d) 869.

The income from the contracts was spread out over the period of the contracts, not bunched in the respective period in which the last gun mount under each contract was delivered. The method used by petitioner in recording income from the government contracts as the right to receive payment accrued clearly reflected its income and, as will be shown *infra*, was in conformity with the normal method of accounting regularly employed by petitioner.

Petitioner is not entitled under either section 736 (b) or section 721 (a) (2) (B) to report its income from the government contracts on a percentage of completion basis.

Petitioner contends further that it regularly employed a percentage of completion method in keeping its books, and that the method which it used to report income from the two government contracts conflicted with this method. We do not agree.

Section 41 of the Internal Revenue Code provides that taxable net income shall be computed on the basis of the taxpayer's annual accounting period in accordance with the method of accounting regularly employed in keeping its books. If income is derived from long term contracts which cover a period in excess of one year from the date of execution of the contract to the date on which the contract is completed, the taxpayer may elect to report such income on a percentage of completion basis instead of reporting it all in the year in which the contract is completed and final payment received. Regulations 111, section 29.42–4, regulations similar to which were approved in *Hegeman-Harris Co.* v. *United States*, 23 Fed. Supp. 450; *Bent* v. *Commissioner*, 56 Fed. (2d) 99, affirming 19 B. T. A. 1356; *Alfred E. Badgley*, 21 B. T. A. 1055, affd., 59 Fed. (2d) 203.

However, unless we should hold that the government contracts in question were of that nature, petitioner never derived income from long term contracts with the exception of one contract entered into in 1937. Since its contracts were not long term contracts, it was not entitled to report income on a percentage of completion basis. Under the standard form of contract used by petitioner in 80 per cent of its business, petitioner was entitled to receive payment of part of the contract price each month on the basis of work completed. Petitioner reported its income from these contracts on an accrual basis. *Maloney* v. *Hammond*, 176 Fed. (2d) 780. And being on an accrual basis, it reported income as it became entitled to receive payment for that part of the contract which was completed. *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182.

Petitioner reported its income from the government contracts on a similar accrual basis. As it delivered the gun carriages and became entitled to receive payment for them, it reported its income from the completion of that part of the contract. The only difference between

the method followed by petitioner in accounting for income from its regular contracts and the method followed in accounting for income from the government contracts was in the way that the payment to which petitioner was entitled was computed. In both instances, however, the payments were computed under the provisions of the contracts which provided for such payments to be made. Since petitioner was entitled to regular payments under both its ordinary contracts and the government contracts, in each instance, as the right to receive payments accrued, it recorded the amounts due in its books.

The method used by petitioner to report its income from the government contracts clearly reflected income and was in conformity with the method of accounting which it regularly employed. Its income from the government contracts was reported in the periods in which the income was determined. Petitioner is not entitled to report the income from such contracts on a percentage of completion basis. Section 41 of the Internal Revenue Code; cf. *Maloney* v. *Hammond*, *supra*.

*Issue 3.*—Petitoner computed depreciation on its buildings, machinery and equipment, and furnaces, stacks, and ovens on a composite group basis. Under this method of depreciation, a group of items is, for convenience, dealt with as one. In determining the fractional coefficient to be used in the depreciation of the group as a whole, it is assumed that all the items will continue in the group during their entire expectancy. Regulations 111, section 29.23 (e)–3, provides for the deduction of a loss upon the retirement of individual assets of the group as follows:

If the depreciable assets of a taxpayer consist of more than one item and depreciation, whether in respect of items or groups of items, is based upon the average lives of such assets, losses claimed on the normal retirement of such assets are not allowable, inasmuch as the use of an average rate contemplates a normal retirement of assets both before and after the average life has been reached and there is, therefore, no possibility of ascertaining any actual loss under such circumstances until all assets contained in the group have been retired. In order to account properly for such retirement the entire cost or other basis of assets retired, adjusted for salvage, will be charged to the depreciation reserve account, which will enable the full cost or other basis of the property to be recovered.

In cases in which depreciable property is disposed of due to causes other than exhaustion, wear and tear, and normal obsolescence, such as casualty, obsolescence other than normal, or sale, a deduction for the difference between the basis of the property (adjusted as provided in section 113 (b) and sections 29.113 (a) (14)–1, and 29.113 (b) (1)–1 to 29.113 (b) (3)–2, inclusive) and its salvage value and/or amount realized upon its disposition may be allowed subject to the limitations provided in the Internal Revenue Code upon deductions for losses, but only if it is clearly evident that such disposition was not contemplated in the rate of depreciation.

\* \* \* \* \* \* \*

The reason for the disallowance of the loss at the time of a *normal*

retirement is that the premature retirement of one asset in the group will probably be offset by the service of another asset in the group for a longer period than estimated. Thus, until all the items in the group have lived out their normal lives, there is no basis for the computation of any loss. *United States Industrial Alcohol Co.*, 42 B. T. A. 1323, 1377; see, also, Kester, Advanced Accounting (4th ed. 1946), pp. 289–90.

The parties are in agreement that petitioner sustained a loss of $19,894.84 upon the retirement of assets during the fiscal year ended June 30, 1941. The only question for decision is whether the loss resulted from the normal retirement of the assets or from an abnormal disposition which was not contemplated in the depreciation rates.

The evidence shows that petitioner scrapped or sold for their salvage value the assets in question either because they were unusable in connection with the government contracts or because they were in the way of additions to or rearrangements of petitioner's plant necessary to perform the defense contracts. Some of these assets were sold for their salvage value; some were torn down and not replaced; and some were torn down and rebuilt out of new materials in another section of the plant. The premature disposition of the assets in question because of the conversion of petitioner's plant from peacetime production to war production did not constitute normal retirement of the assets. Nor could the rates used to depreciate the groups as a whole have contemplated the abnormal retirement of the assets from such an unanticipated cause. The necessity for and the actual scrapping of the assets prior to the termination of their normal useful life was the direct cause of petitioner's loss. See *Industrial Cotton Mills Co.*, 43 B. T. A. 107; *United States Industrial Alcohol Co.*, *supra*, at p. 1379.

Allowance of this loss will not result in a double deduction in any year as respondent seems to fear. Upon the allowance of the loss deduction for these assets, the cost basis thereof is eliminated from the asset accounts and the depreciation reserve is reduced by the amount of depreciation already taken. The base to which the composite group depreciation rate is applied will thereby be reduced by the cost basis of the assets abnormally retired. See *Illinois Pipe Line Co.*, 37 B. T. A. 1070, 1081.

It is held that the loss sustained by petitioner in the abnormal retirement of assets which were being depreciated on a composite group basis is deductible from gross income.

*Decision will be entered under Rule 50.*